RICARDO MOLINA, PLAINTIFF, v. COMISION REGULADORA DEL MERCADO DE HENEQUEN, DEFENDANT.

Argued December 19, 1917—Decided March 4, 1918.

The well-established principle of immunity from legal proceedings, granted in our courts to an independent sovereign, does not extend to a foreign corporation which is a governmental agency of a political subdivision of a foreign government, or to one in which a foreign government is indirectly interested because the work of such corporation contributes to the prosperity of the foreign country.

On motion to dissolve attachment.

Before Justice SWAYZE, by consent.

For the motion, *Robert H. McCarter* and *Nelson S. Spencer* (of New York), *Otto C. Wierum, Jr.,* and *Arthur F. Egner* on the brief.

For the plaintiff, *Robert S. Hudspeth* and *W. B. Roulstone* (of New York), *Nelson Gamman* and *Anton Singer* on the brief.

The opinion of the court was delivered by

SWAYZE, J.   This is a motion to dissolve an attachment which was issued pursuant to sections 84 and 85 of the Practice act. *Comp. Stat., pp.* 4076, 4077. Affidavits have been taken on the part of the defendant. Prior to 1903, we held in an attachment under the act of 1893, the predecessor of the sections 84 and 85 of the present Practice act, that if the affidavits of the plaintiff were sufficient to support the order, it could not be questioned by counter affidavits tending to show their falsity. *Mercantile Bank* v. *Pequonnock Bank,* 58 *N. J. L.* 300. Section 86 of the Practice act of 1903 later enacted that proceedings for the vacation of the order shall be the same as for setting aside an order for bail. These proceedings, as far as they relate to a controversy as to the truth of the plaintiff's affidavits, are set forth in section 62. *Comp. Stat., p.* 4071. An order of the court is necessary for the taking of testimony either orally before the judge or in writing before a commissioner, examiner or master in Chancery designated by the judge. This course was not pursued in the present case and strict practice would require that the defendant's affidavits be rejected. But the point was not made; counter affidavits have been submitted and the case argued with great thoroughness. I have therefore examined the affidavits on both sides and call attention to the practice only because it is important that proofs be taken under a judge's order which would, of course, provide for the right

of cross-examination. The defendant's affidavits are reprehensible in another respect, which would have been avoided had this course been followed. They are in great part merely lawyers' arguments, inferences to be drawn from facts and hearsay statements. This has made it a matter of difficulty to extract what is really evidential from what is merely argument or hearsay. The objection is serious, since it is obvious that the affiants regarded themselves as advocates rather than as witnesses, and the weight to be given to their statements is no greater than the weight to be given to the arguments of reputable counsel.

The essential facts are not in serious dispute. The defendant is a corporation of the State of Yucatan, one of the states composing the United States of Mexico. It has sued and been sued in our courts; it has been sued by its name by the United States Government; verification of documents in its behalf show that it is an artificial person appearing by its name and presenting affidavits made on its behalf because of its inability to make them itself. It has a board of directors; farmers growing sisal or heneguen are interested in its operations and contribute to its capital and share in its earnings. Indeed, it is conceded that it is a corporation. The point made is that it is a governmental agency of the State of Yucatan, and therefore entitled to immunity from proceedings in our courts. It is a corporation created by the State of Yucatan to carry out, or assist in carrying out, certain policies of that government with reference to the growth and sale of sisal hemp, the most important product of Yucatan. Immunity is claimed under the theory that the defendant is a branch of the sovereignty of a foreign state. The question of the right to immunity of a foreign sovereign from our judicial process concerns, or may concern, the foreign relations of the United States. For that reason, I communicated with the state department as soon as the motion was made before me. I was informed by that department that the defendant had asked the department to request the attorney-general to appear before this court as *amicus curiæ*, to present the question of jurisdiction, and that the depart-

ment did not feel justified in recommending that the attorney-general take such action, for the reason that political subdivisions of a foreign government engaging in ordinary commercial transactions must be regarded as subjecting themselves to the obligations arising from commercial transactions if they are also to reap the benefits and enjoy the rights of trade. This very sensible position of our government makes it clear that the present case is free from any political complications, and leaves it to be determined purely as a legal question.

The situation differs materially from that usually presented where the government itself intervenes as *amicus curiæ.* I have been furnished by counsel for the defendant with a copy of a letter from the Mexican ambassador to the secretary of state, under date of January 14th, 1918, suggesting that the property attached is the property of the Mexican government and immune from the process of this court.

Ample time has elapsed for the United States government or the Mexican government to make representations to this court as to the rights of the latter. None have been made. Probably because the letter itself states in another passage that the comision reguladora has purchased the sisal hemp now under attachment from the federal government (of Mexico) and is a legitimate owner of said hemp; and in another passage that the comision reguladora is "indirectly an agency of the federal government, inasmuch as the federal government is interested in the development of all industries of Mexico, and it has been proved necessary for the proper development of this industry that such a regulating commission is not only important but indispensable."

The determination of the present motion cannot be influenced by a communication not addressed to the court, but to the state department, and called to my attention not by that department but by counsel for the defendant. The silence of the department of state since January 14th confirms my previous information that the government of the United States is not at all concerned. The government of Mexico is not

sufficiently concerned to have its interests suggested to the court by its own representative as *amicus curiæ* or otherwise.

I come, then, to the question of the immunity of the comision reguladora. The immunity of an independent foreign sovereign in our courts is well established. The reasons on which it rests are set forth with his usual lucidity by Chief Justice Marshall. *Schooner Exchange* v. *McFadden, 7 Cranch* 116. To what extent, if at all, this rule of immunity is to be modified by the change of times which leads not only political subdivision of foreign governments but foreign governments themselves to engage in ordinary commercial transaction abroad, is a question I need not now consider, except to call attention to the weighty words of Chief Justice Marshall in *Bank of the United States* v. *Planters Bank of Georgia, 9 Wheat.* 904, which I quote hereafter.

The present suggestion is that this immunity extends to a foreign corporation if it is a governmental agency of a political subdivision of a foreign government, or if a foreign government is indirectly interested in the corporation because its work contributes to the prosperity of the foreign country. The proposition is a startling one. If it is correct, corporations of foreign governments, if they are governmental agencies, may come into New Jersey regardless of any restrictions imposed by our statutes since we shall be unable to enforce our own laws by judicial proceeding against them, and upon the same principle the United States government will be unable to enforce acts of congress. Since a foreign government may make any corporation a governmental agency, fiscal, commercial or otherwise, it will rest entirely with foreign governments whether they will clothe their own corporations with the extremely valuable privilege of immunity from judicial proceedings, a privilege so valuable that domestic corporations of our own creation compellable to pay their debts by means of judicial process, would have no chance in the race of competition. Our corporations would be actually subject to the restraint of our statutes; foreign corporations would be only nominally subject thereto.

If we are to go further and extend this immunity to foreign corporations, in which foreign governments are indirectly interested because they contribute to the prosperity of the country, as suggested in the letter of the Mexican ambassador, nothing will be left for our own citizens to do except to avail themselves of the same privilege in foreign lands and conduct their affairs abroad where they may hope for at least an equal chance. I think it safe to say that no authority can be found in the books for the proposition that foreign corporations which happen to be governmental agencies are immune from judicial process. None of the reasons given for the immunity of sovereigns are applicable to corporations, whether governmental agencies or not. The importance of preserving the immunity of sovereigns in order to preserve the independence of the states, the obligation of a sovereign not to degrade the dignity of his nation by placing himself or its sovereign rights within the jurisdiction of another—the perfect equality and absolute independence of sovereigns —the common interest impelling them to mutual intercourse and an interchange of good offices with each other, are the underlying reasons for the immunity of sovereigns, as stated by Chief Justice Marshall. None of these reasons is applicable to a commercial corporation, even though it may be a governmental agency. As the Chief Justice says: "When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purpose of trade, it would be obviously inconvenient and dangerous to society, and would subject the law to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance and were not amenable to the jurisdiction of the country."

The case of *Schooner Exchange* v. *McFadden, supra,* was the case of a public armed vessel claimed by the French government. Previously to that decision, it had even been a question whether public armed vessels were immune. The cases cited by the defendant do not sustain his claim. *Duke of*

*Brunswick* v. *King of Hanover,* 2 *H. L. C.* 1, and *Mighell* v. *Sultan of Johore* (1894), 1 *Q. B.* 149, were suits against sovereigns.

*Magdalena Steam Navigation Co.* v. *Martin,* 2 *El. & E.* 94, was a suit against a public minister who on well-settled principle was in the place of his sovereign.

In *Vavasscur* v. *Krupp, L. R.,* 9 *Ch. Div.* 351, the shells were the property of a foreign government itself, not of a corporation, which was merely a governmental agency. In *Briggs* v. *Light Boats,* 11 *Allen* 157, the boats on which a lien was claimed were the property of the United States government itself, necessary for the performance of the public service. In the *Parlement Belge, L. R.,* 5 *Prob. Div.* 197, the boat which had been libeled was a mail steamer, the property of the King of the Belgians. The case is an authority for the proposition that a sovereign who owns property used for a governmental service, is not deprived of his immunity merely because in connection with the governmental service, he also carries on a commercial business. To this extent the ruling in, in *The Charkieh,* 42 *L. J. Adm.* 17; *L. R.,* 4 *Adm. & Eccl.* 59, is overruled. In *Young* v. *S. S. Scotia* (1903), *A. C.* 501, the proceeding was against a vessel, the property of the Dominion of Canada, and, therefore, as it was held, the property of the king. In the *Constitution, L. R.,* 4 *Prob. Div.* 39, the vessel sought to be held for salvage was a vessel of war. In the *Jassy* (1906), *L. J., Privy Council* 93, the vessel was the property of the King of Roumania, employed for the public purposes of the state in connection with the national railways in Roumania. In *Mason* v. *Intercolonial Railway of Canada* (*Mass.*), 83 *N. E. Rep.* 876, the railway was the property of the King of England, and not of a business corporation, operated through his government of Canada for the public purposes of Canada.

In all these cases the determining fact was that the property was the property of the foreign sovereign. In none was the action against a mere business corporation. It is not claimed that the comision reguladora was owned by the government of Yucatan. It seems that growers of sisal hemp

and the government of Yucatan were alike interested. The case seems somewhat analogous to the original United States Bank in which both the government and private citizens were interested as stockholders and the government also because the bank had been incorporated to act as its fiscal agent. To such a case the reason for immunity does not extend. *Bank of the United States* v. *Planters Bank of Georgia,* 9 *Wheat.* 904.

The State of Georgia was a corporator of and stockholder in the Planters Bank. The bank, in an action on its notes, pleaded to the jurisdiction. The court held that the bank was not exempt from being sued by the circumstance that the state was a corporator. Chief Justice Marshall said:

"It is, we think, a sound principle that when a government becomes a partner in any trading company, it divests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates itself, and takes the character which belongs to its associates, and to the business which is to be transacted. Thus, many states of this union which have an interest in banks, are not suable even in their own courts; yet they never exempt the corporation from being sued. The State of Georgia, by giving to the bank the capacity to sue and be sued, voluntarily strips itself of its sovereign character, so far as respects the transactions of the bank, and waives all the privileges of that character. As a member of a corporation, a government never exercises its sovereignty. It acts merely as a corporator and exercises no other power in the management of the affairs of the corporation than are expressly given by the incorporating act.

"The government of the union held shares in the old bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank in the sense of the constitution. So with respect to the present bank. Suits brought by or against it are not

understood to be brought by or against the United States. The government, by becoming a corporator, lays down its sovereignty, so far as respects the transactions of the corporation, and exercises no power or privilege which is not derived from the charter."

This was approved and followed a few years later in a case where the Bank of Kentucky pleaded to the jurisdiction that the State of Kentucky was sole proprietor of the stock of the bank. The rule has recently been reiterated in *Hopkins* v. *Clemson College*, 221 *U. S.* 636. The reason for immunity is not applicable to such cases.

The dignity of the government, if it suffers at all, suffers because it voluntarily enters into a commercial enterprise and its independence is not affected by proceedings against the corporation. The extension of the rule of immunity has been carried far, since in Marshall's day it was a question whether even a public vessel of war was immune from seizure; but it has never been carried so far as to permit a foreign government to detract from the independence and dignity of the nation which was hospitable to its corporations by making them public agencies and thereby attempting to withdraw them from the jurisdiction of their host. The independence and dignity of a state requires that it should be free to exercise jurisdiction quite as much as in a different case it should refuse to exercise jurisdiction. The dignity and independence of New Jersey is quite as important as the dignity and independence of Yucatan. Our dignity and independence would suffer if we should be unable to exercise jurisdiction in our own borders over a business corporation which is here only by our courtesy. That courtesy is extended, or must be assumed to be extended, to the corporation upon terms that it shall be subject to our law.

I have thus far dealt with the case as if the State of Yucatan was one of the sovereign states which is immune from the jurisdiction of the courts of another state. That view is too favorable to the defendant. It is clear, from the affidavits and the extracts from official documents, translations of which have been attached, that Yucatan is a member of

the federated State of Mexico, and, in external relations, the United States of Mexico is alone sovereign. "A federated state," says a writer of repute on international law, "is an independent, central organism having its own machinery (*rouages*) which absorbs, in the view of international law, all the individual states which are associated together. The federal power has alone and exclusively the enjoyment and exercise of external sovereignty. It alone has the direction of external relations. The independence of each associated state in this respect is sunk in the sovereignty of the federal state. *Bonf. Droit Inter. Pub.*, § 172. Bonfils merely states the unanimous opinion of writers on international law, so far as I have been able to examine them. *Blunt.*, ¶ 70; *Wheat.*, § 46; 1 *Moo. Inter. L. Dig.* 23, § 11, quoting Wheaton; *Hall Inter. L.* (*5th ed.*) 24, 25.

The members of a federal republic are universally treated as having no independent existence as states in their external relations. Lacking this independence, they lack the very foundation for the right to immunity from judicial process.

It is argued that, in addition to the immunity of states fully sovereign under the rules of international law, states of imperfect sovereignty, such as members of a federal union, are not subject to suit under the rules of municipal law. Without stopping to consider the general proposition, it is enough to say that the present suit is not against the State of Yucatan, but against a business corporation in which that state may be more or less directly interested. Even under the eleventh amendment to our federal constitution, it is settled that suits may be maintained against officers of a sovereign state. So far has this gone that an attorney-general has been enjoined from enforcing a state statute or bringing an indictment. *Ex parte Young*, 209 *U. S.* 123; *Smyth* v. *Ames*, 169 *Id.* 466.

There is no general principle which prevents an action against a state, aside from the rule of immunity above set forth. Indeed, the constitution of the United States expressly provides for jurisdiction in the federal courts in such cases. *The Charkieh* above cited is authority for the proposition

that, except in the case of immunity arising from sovereignty, an action will lie against a foreign government not completely sovereign.

The subsequent criticism of this case in the Parlement Belge did not go to this feature. It was not even suggested that a state of imperfect sovereignty was not subject to the jurisdiction of the courts.

There is a narrower objection made to the present proceedings. It is said the action is brought to recover damages for the conversion of crops grown on the plaintiff's land in Yucatan, and that this action will not lie, but that plaintiff must secure his redress by a local action of which the courts of Yucatan alone have jurisdiction. *Lehigh Zinc and Iron Co.* v. *New Jersey Zinc and Iron Co.*, 55 *N. J. L.* 350, is appealed to as authority. That rule, however, is applicable only in case the defendant was in open, peaceable, adverse and exclusive possession of the land when the crop was gathered. On this point there is no proof. Much is said in the defendant's affidavits about the sequestration of the plaintiff's land either by the government of Yucatan or by the United States of Mexico; but there is no competent proof of such sequestration. It must have been by some government order or act or some judicial process. The proper way to prove the sequestration would have been to produce a properly exemplified copy of the order, decree or process, or proof of the government acts that deprived the plaintiff of the use of his land, and we ought to have been informed at least of the date of the sequestration, so that we might know whether it was before or after the crops for which the suit is brought were severed. It is true that on the trial of this action the defendant may be able to prove that it had title derived from sequestration proceedings in Yucatan superior to the plaintiff's title; it may be able to show that the situation was such that the plaintiff cannot maintain this transitory action but must bring a local action in the courts of Yucatan. Those questions will properly arise at the trial; they cannot be tried out on the present affidavits on a motion to set aside the attachment.

The motion must be denied, with costs.