The Honorable Pat Thomas Senator, District 3 220 Senate Office Building Tallahassee, Florida 32399-1100
Dear Senator Thomas:
You have asked for my opinion on substantially the following question:
What is the meaning of the term "coastline" as it is used in Article X, section 16(3), Florida Constitution?
In sum:
The term "coastline" as used in Article X, section 16(3), Florida Constitution, means the line where, at low water, the shore along the Florida coast comes in direct contact with the open sea.
Article X, section 16, Florida Constitution, prohibits the use of gill nets or other entangling nets in any Florida waters.[1] In addition to this absolute prohibition, the constitutional amendment limiting marine net fishing provides that:
[N]o other type of net containing more than 500 square feet of mesh area shall be used in nearshore and in shore Florida waters. Additionally, no more than two such nets, which shall not be connected, shall be used from any vessel, and no person not on a vessel shall use more than one such net in nearshore and inshore Florida waters.[2]
For purposes of this section, "nearshore and inshore Florida waters" are "all Florida waters inside a line three miles seaward of the coastline along the Gulf of Mexico and inside a line one mile seaward of the coastline along the Atlantic Ocean."[3] (e.s.) The term "coastline" means "the territorial sea base line for the State of Florida established pursuant to the laws of the United States of America[.]"[4]
You have requested a clarification of the term "coastline" as it is used in Article X, section 16, Florida Constitution, because the area of regulation of the net ban is dependent on a proper legal definition of the term. Florida relies on Federal law for its definition of "coastline."[5] Therefore, the definition utilized by the United States Congress and the United States Supreme Court is controlling.
Prior to the 1930s, there was little need to establish states' boundaries in the open sea. It was taken as a routine matter that a state owned title to the submerged lands beneath the open sea and waters of the Great Lakes to the boundary of the state, and held these lands in trust for the people of the state with the authority to regulate such matters as fishing.[6]
The discovery of oil beneath submerged lands intensified interest in establishing states' boundaries and in determining ownership of submerged lands, and, thus, the oil within those boundaries. The question was a significant one because the United States claimed all the minerals beneath the submerged lands.[7] In 1947 the United States Supreme Court ruled that, as against California, the United States possessed paramount rights in the submerged lands of the Pacific Ocean seaward of the low-water mark on the coast of California.[8] Subsequent to this decision, the Court found similarly against Louisiana and Texas.[9]
Congress reacted to these decisions by enacting the Submerged Lands Act of 1953.[10] Congress defined "coast line" to mean "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters[.]"[11] Congress then definitively confirmed title to the submerged lands and the natural resources beneath such submerged lands to the states[12] and relinquished all right, title and interest the United States had in these submerged lands.[13] Finally, Congress defined the seaward boundary of the coastal states as "a line three geographic miles[14] distant from its coast line. . . ."[15] Congress allowed any state to extend its seaward boundary beyond the three geographic miles if it had proof of such a boundary.[16]
Shortly after the passage of the Submerged Lands Act, the states along the Gulf of Mexico, including Florida, asserted claims that would extend their boundaries beyond three geographic miles. The cases reached the Supreme Court in 1960.[17] While the Court did not address the definition of "coast line,"[18] the case did decide the "geographic extent to which the [Submerged Lands Act] ceded to the States the federal rights" in these submerged lands.[19]
There was no question that the Submerged Lands Act confirmed title in the submerged lands to Florida within three geographic miles of the coast line on the Atlantic Ocean, and at an equal distance in the Gulf of Mexico.[20] The issue to be decided was whether Florida could prove its claim to three marine leagues[21] into the Gulf of Mexico.[22]
The Court began its discussion of Florida's claim by noting that the Submerged Lands Act permitted boundaries outside of the three miles if the state had claimed the boundary when it came into the Union or was "approved by Congress."[23] Florida made both claims for the Gulf of Mexico, i.e., it claimed a three league boundary at the time it entered the Union in 1845 and maintained that Congress approved its boundary upon Florida's readmission into the Union after the Civil War.[24] The Court did not discuss Florida's first assertion, finding that Congress had "approved" the state's boundary upon readmission into the Union.[25]
The Supreme Court based its holding on Florida's three league boundary assertion on the fact that Article I, Florida Constitution (1868), describing the state's boundaries, contained the phrase "three leagues from the mainland" when delineating the seaward boundary of the state in the Gulf of Mexico. This Constitution was created because of the congressional acts of March 2, 1867,[26] and March 23, 1867,[27] requiring congressional approval of all former confederate states' constitutions. The Constitution was submitted according to law, considered and approved by Congress.[28] Because the 1868 Florida Constitution was approved by Congress, which approval met the terms of the Submerged Lands Act,[29] the Court approved Florida's three league boundary in the Gulf of Mexico.[30] The case was then retained for further proceedings to actually determine the coast line and fix the seaward boundary of Florida.[31]
Later that same year, and arising out of the same series of cases from the Gulf coast states, the Supreme Court set the meaning of "coast line" in its earlier decree.[32] The Court defined the term to mean "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limits of inland waters."[33]
During the late 1950s, the coastal countries of the world proposed, discussed, and drafted a treaty known as the Convention on the Territorial Sea and Contiguous Zone, April 29, 1958.[34]
The hope was to provide uniformity in the delineation of the nations' territorial sea. Rather than using the term "coast line," the Convention used the term "baseline" in the measurement of the territorial sea. Article 3 defines the "baseline" for measuring the territorial sea as "the low water line along the coast as marked on large-scale charts officially recognized by the coastal State." The Convention was ratified by the United States in 1961 and became effective in 1964.[35] It is as a result of the Convention that the term "baseline" is used regarding coastline issues.
Shortly after ratification of the Convention, the Supreme Court had before it the question of the territorial boundaries of the state of California.[36] In order to assure consistency and set one "coastline," the Supreme Court adopted, for the purposes of the Submerged Lands Act, the definitions contained in the Convention.[37] The Supreme Court has continued to follow the definitions in the Convention as the defining terms in establishing the states' territorial boundaries.[38] This is not to say the Court has abandoned the definitions in the Submerged Lands Act; it has not. The Court still refers to the Act when discussing "coastline."[39]
By applying both the Convention and the Submerged Lands Act to Article X, section 16, Florida Constitution, the following results:
A. "Coastline" is the low water line that meets the shore along the coast of Florida which is in direct contact with the open sea. A coastline can never begin in open water; a coastline, in plain terms, is where the water meets the land.
B. "Florida waters" are those waters in the Atlantic Ocean out to three (3) geographic miles from the coastline and in the Gulf of Mexico out to three (3) marine leagues, or 9 geographic miles, or approximately 10.376 statute miles, from the coastline.
C. "Nearshore and inshore waters" are those State waters within one (1) geographic mile of the coastline in the Atlantic Ocean and three (3) geographic miles of the coastline in the Gulf of Mexico.
Thus, the prohibitions of Article X, section 16(b)(2), Florida Constitution, would apply to waters inside a one (1) geographic mile limit in the Atlantic Ocean and inside a three (3) geographic mile limit in the Gulf of Mexico measured from the low water line. This distance corresponds to 1.15 miles, as measured on land, in the Atlantic Ocean; and 3.45 miles, as measured on land, in the Gulf of Mexico.
Sincerely,
Robert A. Butterworth Attorney General
RAB/tgk
[1] See, Art. X, s. 16(b)(1), Fla. Const. 
[2] Id. s. 16(b)(2).
[3] Id. s. 16(5).
[4] Id. s. 16(3).
[5] Id.
[6] Illinois Central Railroad Company v. State of Illinois,146 U.S. 387 (1892).
[7] United States v. State of California, 332 U.S. 19, 22-25
(1947).
[8] Id.
[9] United States v. State of Louisiana, 339 U.S. 699 (1950); United States v. State of Texas, 339 U.S. 707 (1950).
[10] 43 U.S.C. § 1301, et.seq.
[11] Id. s. 1301(c).
[12] Id. s. 1311(a).
[13] Id. s. 1311(b).
[14] The term "geographic" mile is often used interchangeably with "nautical" mile. However, a "geographic" mile is slightly longer. A "geographic" mile is the length of one minute of the arc of the equator, or 6,087.08 feet. American Practical Navigator, Nathaniel Broditch LL.D. (1981), p. 812. A "nautical" mile is 6,076.11549 feet. Id. at 116. A "statute" or "English" mile (used on land) is 5,280 feet. Thus, a "geographic" or "nautical" mile is 1.15 "statute" or "English" miles.
[15] Three geographic miles had long been the recognized seaward boundary of the United States. See, e.g., Cunard Steamship Company v. Mellon, 262 U.S. 100, 122-123 (1923). Codification of43 U.S.C. § 1312 was the first congressional recognition of this accepted legal fact.
[16] Id.
[17] United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 363 U.S. 1 (1960); the case concerning Florida is cited at 363 U.S. 121 (1960).
[18] Id. at 20 (" . . . this Court has never had occasion to consider the precise nature and method of determining state territorial boundaries in the open sea,. . . .")
[19] A "marine league" is equal to one-twentieth of a degree of latitude, or three "geographic" or "nautical" miles. Black's Law Dictionary 872 (5th ed. 1979). See also, Cunard Steamship Company v. Mellon, 262 U.S. at 122-123. Three marine leagues is equal to nine "geographic" miles; nine "geographic" miles is equal to 10.376 statute miles.
[20] United States v. Louisiana, 363 U.S. at 123.
[21] Id. at 7.
[22] Id. at 122-123.
[23] Id. at 122.
[24] Id. at 123.
[25] Id.
[26] 14 Stat. 428.
[27] 15 Stat 2.
[28] 15 Stat. 73.
[29] United States v. States of Louisiana, et al.,361 U.S. at 127.
[30] Id. at 129.
[31] Id.
[32] United States v. States of Louisiana, Texas, Mississippi, Alabama and Florida, 364 U.S. 502 (1960).
[33] Id. at 503.
[34] "Territorial Sea Baseline" is now defined in Federal law as the "delimitation of the shoreward extent of the territorial seas of the United States drawn in accordance with principles, as recognized by the United States, of the Convention on the Territorial Sea and Contiguous Zone, 15 U.S.T. 1606." 33 C.F.R. § 2.05-10.
[35] 15 U.S.T. 1606, T.I.A.S. No. 5639.
[36] United States v. State of California, 381 U.S. 139 (1965).
[37] Id. at 165.
[38] See, United States v. Louisiana, 394 U.S. 1, 4-5 (1969); United States v. Louisiana, 394 U.S. 11, 21 (1969); United States v. Alaska, 422 U.S. 184, 188 (1975).
[39] United States v. Maine, 469 U.S. 504, 512-514 (1985); United States v. Louisiana, 470 U.S. 93, 94-96 (1985).